452 P.2d 350

STATE of Idaho, Plaintiff-Respondent,

v.

Jimmie Jim SANDOVAL, Defendant-Appellant.

No. 10289.

Supreme Court of Idaho.

March 25, 1969.

Alan D. Wilson, Mountain Home, for appellant.

Allan G. Shepard, Atty. Gen., and George C. Detweiler, Asst. Atty. Gen., Boise, Fred Kennedy, Pros. Atty., Elmore County, Mountain Home, for appellee.

DONALDSON, Justice.

Defendant (appellant) Jimmie Jim Sandoval was convicted and adjudged guilty of involuntary manslaughter as defined in I.C. § 18–4006(2) (a).[1]

The facts adduced at trial show that appellant was driving a 1957 Buick Sedan in a westerly direction on U. S. Highway #30 in Elmore County early on the morning of November 5, 1967. Three other persons were passengers in the Buick, but claimed to be asleep at the time of the accident. According to witnesses who were driving in a vehicle behind Sandoval's car, the Buick was traveling at 50 mph in an erratic manner, weaving from side to side in the westbound lane. At approximately 1:40 A.M., about five miles east of Mountain Home, Sandoval's auto crossed over into the eastbound lane and brushed against an eastbound trailer truck. The left front tire and fender of the Buick sideswiped the left rear tires of the trailer. The Buick continued moving westerly in the eastbound lane until a short distance later it ran head-on into a 1965 Falcon station wagon which was being driven in an easterly direction in the eastbound lane. The driver of the Falcon, Viola Jean Lewis, was killed in the accident.

Appellant testified that a sudden blowout in the left-hand front tire of the Buick caused it to veer into the eastbound lane. While it is true that the tire in question was deflated when examined following the accident, other evidence indicated that the deflation occurred when Sandoval's car struck the tires of the trailer. There was evidence, including testimony of appellant, himself, that Sandoval had imbibed at least four twelve-ounce cans of beer during the evening prior to the collision. Twelve empty cans and four full cans of beer were found in the Buick.

The road was two-lane, straight, slightly undulating and dry. The night was dark and clear. Visibility was such that Sandoval should have seen the lights of the oncoming trailer truck and Falcon station wagon.

Upon conviction, following a verdict of guilty by the jury, the Court sentenced appellant to three years imprisonment in the Idaho State Penitentiary. Sentence was suspended on condition:

(1) that appellant serve six months in the Elmore County Jail, less time already served;

(2) that appellant agree to be placed on probation to the Idaho State Board of Cor-

---

1. "18–4006. *Manslaughter defined.*—Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary—in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, kidnapping, burglary, or mayhem; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; or in the operation of any firearm or deadly weapon in a reckless, careless or negligent manner which produces death; or in the operation of a motor vehicle:

(a) In the commission of an unlawful act, not amounting to a felony, with gross negligence; or,

(b) In the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence; or,

(c) In the commission of an unlawful Act, not amounting to a felony, without gross negligence; or,

(d) In the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.

Provided, this provision relating to operation of a motor vehicle shall not be construed as making any homicide in the driving of a vehicle punishable as involuntary manslaughter which is not a proximate result of the commission of an unlawful act, not amounting to a felony, or of the commission of a lawful act which might produce death in an unlawful manner."

rections for the remainder of the three years;

(3) that appellant not operate a motor vehicle in the United States during his period of probation.

Several of appellant's assignments of error concern admission into evidence of incriminating statements made by Sandoval prior to arrest. Over objection, state's rebuttal witness Deputy Sheriff Robert J. Mendiola testified to the statements which were made in answer to questions posed by Mendiola and by Prosecuting Attorney Kennedy. The questioning took place on November 7, 1967, at approximately 11:00 A.M. in appellant's room in the Elmore Memorial Hospital where appellant was recovering from minor injuries suffered in the accident. Two law enforcement officials (the prosecutor and the uniformed deputy sheriff) were present, as well as another, unnamed, patient. A nurse, Margaret Gillespie, was present prior to questioning but left during the actual interrogation. Appellant was in bed when interrogated. At a pre-trial hearing on a motion to suppress evidence, Mendiola and Nurse Gillespie declared that appellant was fully advised of his *Miranda* rights. They testified that he specifically waived his right to remain silent and to have counsel present. He also signed and initialled a "notification of rights:"

## "NOTIFICATIONS OF RIGHTS

"Before we ask you any questions, you must understand that you have certain rights under both the Idaho and United States Constitutions. You do not have to talk to us. You have the absolute right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have the advice and presence of a lawyer even if you cannot afford to hire one. If you want a lawyer and cannot afford one you have the absolute right to remain silent until one is appointed to represent you, which will be done at public expense. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time and remain silent.

## "WAIVER

"(Place initials at the end of each statement below only after you completely understand what such statement means.)

I have read the above statement of my rights and understand that:

1. I have the absolute right to remain silent. *J.S.*
2. Anything I say can and will be used against me in court. *J.S.*
3. I have the right to the advice of a lawyer before answering any questions. *J.S.*
4. I have the right to have a lawyer present during any questioning. *J.S.*
5. I have the right to a lawyer even if I am needy and therefore cannot afford one and one will be appointed to represent me, if I wish, at this stage of the proceeding, at public expense. *J.S.*
6. If I choose to answer any questions without the advice of a lawyer being present, I have the right to stop answering questions at any time and remain silent. *J.S.*

"I can read and write the English language, or if I cannot, the above rights were explained to me by an interpreter who speaks the language I can read and write. I am willing to answer questions and make

a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats' have been made to me, and no pressure of any kind has been used against me.

Signed: /s/ Jimmie Sandoval

/s/ Margaret P. Gillespie
——————————————
Witness

Hospital
——————————————
Place

/s/ R. J. Mendiola
——————————————

11–7–67
——————————————
Date

10:27 a. m.
——————————————
Time"

———◆———

At the time of the questioning the deputy sheriff knew that appellant was the driver of the Buick sedan, believed that a crime had been committed when the accident took place, and believed that the appellant would be accused of a crime. Nevertheless the deputy sheriff contended that he and the prosecuting attorney questioned appellant in order to complete an accident investigation report. After the visit in the hospital a complaint was sworn to by Mendiola and a warrant for Sandoval's arrest was issued.

The conversation in the hospital room was conducted in English. Mendiola and Gillespie both gave evidence that appellant was able to speak and understand the English language. Other evidence indicated that appellant had received 5 years of schooling, ordinarily spoke Navajo, but had some basic knowledge of English. The pre-trial hearing and the trial were conducted in English. Defendant testified at length in English at each proceeding. At no time did his counsel request an interpreter. Nevertheless appellant stated that he could not understand many of the terms used by the law officers when being informed of his *Miranda* rights. He also said that he was afraid he would be thrown in jail if he did not answer the questions posed. However Sandoval said that this was his personal belief, resulting from conversations with friends who had been arrested at other times, and not an idea that had been put in his mind by

Mendiola or the prosecuting attorney. It was also established that appellant never before had been in trouble with the police. When the proceedings took place appellant was 21 years old, had lived practically all his life on an Indian reservation, and had had only minimal contacts with white society. At the conclusion of the hearing, the district judge stated from the bench:

"THE COURT: There appears to be a series of questions involved here. I have no doubt, Mr. Kennedy, but what the rights of the defendant were thoroughly and adequately explained to him and he was thoroughly and adequately apprised of his rights. The only question is whether or not he understood them.

"Certainly from his testimony there would be a doubt cast upon the ability of the defendant to understand. It is difficult, particularly with the leading questions and he appeared to be susceptible to leading questions from counsel and the Court.

"His background would show, I believe, that he is capable of understanding, particularly when someone says, 'You don't have to say anything if you don't want to tell us.'

"Another question is whether or not this is an investigatory or accusatory state of the proceeding. I would tend to think that they were law enforcement people in the investigatory state of the proceeding rather than making an accusation against the defendant. Deputy Mendiola

testified he went up there to fill out the accident report in addition to getting other information on the accident."

In its order denying the motion to suppress evidence, the court found:

"* * * that at the time of said conversation, the investigation was a general inquiry into an unsolved crime but had begun to focus on a particular suspect, but that said defendant was not in custody of law enforcement officials at that time.

*   *   *   *   *   *

"* * * That * * * the above named defendant could speak and understand the English language, which is the language used by the said Robert J. Mendiola and Jimmie Jim Sandoval during said conversation.

*   *   *   *   *   *

"That * * * defendant * * * knowingly and intelligently waived his right to such attorney and his right to remain silent, and the resulting admission or confession made by the defendant, if any, after said waiver is a voluntary statement and should be admissible in evidence against the above named defendant in the trial of said cause."

The first issue to be resolved is whether such a stage in the proceedings had been reached at the time of the questioning that the appellant was entitled to an explanation of his fifth and sixth amendment rights as vouchsafed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, 10 A.L.R.3d 974 (1966).

Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964), concluded:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335,] at 342, 83 S.Ct., at 795 [9 L.Ed.2d 799, at 804, 93 A. L.R.2d 733,] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S., at 490, 491, 84 S.Ct. at 1765.

*Miranda*, which specifically upheld *Escobedo*, concerned the application of "the privilege against self-incrimination to incustody interrogation, * * *" 384 U.S. at 441, 86 S.Ct., at 1611. The majority opinion stated:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S., at 444, 86 S.Ct., at 1612.

In a footnote to the explanation of custodial interrogation, it was said, "This is what we meant in Escobedo when we spoke of an investigation which had focused on an accused." 384 U.S., at 444, n. 4, 86 S.Ct., at 1612. The term "deprived of his freedom" was limited later in the opinion:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom *by the authorities* in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S., at 478, 86 S.Ct., at 1630. (emphasis added.)

Throughout *Miranda,* it is patent that the evil to be guarded against is the psychological coercion on a person to speak when confronted with official interrogation in a private, isolated, incommunicado, police-dominated atmosphere.

▮ Applying the facts to the law, we do not believe that the atmosphere surrounding the questioning of Sandoval was

tantamount to in-custody interrogation. We do not base our decision on a technical and unrealistic view of the custody requirement, but on all the objective facts, and circumstances of the interview. United States v. Mackiewicz, 401 F.2d 219 (2d Cir. 1968), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968); cf. State v. Carpenter, 92 Idaho 12, 435 P.2d 789 (1967). Defendant was not under arrest; the authorities did nothing to restrain his freedom of action; the questioning took place in a hospital room; another patient was present. Clearly Sandoval was not in custody, either actually or constructively. Hence the *Miranda* and *Escobedo* exclusionary rules are inapplicable. Miranda v. Arizona, *supra*; State v. Martinez, 92 Idaho 183, 439 P.2d 691 (1968), cert. denied, 393 U.S. 945, 89 S.Ct. 317, 21 L.Ed.2d 283 (1968); State v. Carpenter, *supra*.

▮ Assuming, *arguendo, Miranda* to be applicable, nevertheless there is no doubt that Sandoval was informed fully and properly of his rights to counsel and to silence. Likewise it is obvious that he waived such rights. The only other question is whether or not he exercised a knowing and intelligent waiver of the rights. Miranda v. Arizona, *supra*. It is contended that the defendant's knowledge of English was too limited for him to be able to comprehend the explanation of those rights. From the remarks of the court from the bench, it may be inferred that the judge had some initial doubts as to Sandoval's facility for understanding English. However, by later remarks and by his order denying the motion to suppress evidence, it is clear that the district judge resolved his doubts and decided that the defendant had sufficient competency in English to make a knowing and intelligent waiver. The district court complied with the procedure prescribed by the United States Supreme Court for determining the admissibility into evidence of defendant's extra-judicial statements. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908, 1 A.L.R.3d 1205 (1964). While

there was evidence to support both sides of the issue, that supporting the trial court's ruling was sufficient to justify admission of the incriminating statements. Under such circumstances we cannot overturn that ruling. State v. Fisk, 92 Idaho 675, 448 P. 2d 768 (1968); see State v. Ross, 92 Idaho 709, 449 P.2d 369 (1968). The lower court did not err in permitting Deputy Sheriff Mendiola to testify to Sandoval's statements.

Appellant also contends that the delay "in his arrest and subsequent arraignment" was a bar to the use at trial of the statements obtained from him. The time sequence was as follows:

(1) the accident happened at 1:40 A.M., November 5;

(2) the statements were made at 11:00 A.M., November 7;

(3) Appellant was arrested later in the day, November 7;

(4) Appellant was brought before a magistrate, November 8.

It is not argued that there was an unnecessary delay between the time of arrest and the time Sandoval appeared before the magistrate.

▮ Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), held that there is no constitutional right to be arrested. *Hoffa* decided subsequently to *Miranda* totally refutes appellant's theory:

"The petitioner's second argument under the Sixth Amendment needs no extended discussion. That argument goes as follows: Not later than October 25, 1962, the Government had sufficient ground for taking the petitioner into custody and charging him with endeavors to tamper with the Test Fleet jury. Had the Government done so, it could not have continued to question the petitioner without observance of his Sixth Amendment right to counsel. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758,

12 L.Ed.2d 977. Therefore, the argument concludes, evidence of statements made by the petitioner subsequent to October 25 was inadmissible, because the Government acquired that evidence only by flouting the petitioner's Sixth Amendment right to counsel.

"Nothing in *Massiah*, in *Escobedo*, or in any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." 385 U.S., at 309, 310, 87 S.Ct. at 417. (footnote omitted).

At trial, the district court refused to allow Sandoval on direct examination to read to the jury from a book written in English. The purpose of this demonstration was to show defendant's inability to understand English.

"Properly the trial court should initially determine that the confession or admission was voluntarily made as a basis for its admission in evidence. Thereafter, the jury may hear and consider evidence on the voluntariness of a statement for whatever effect such evidence might have upon the weight to be given the confession or admission." State v. Fisk, 448 P.2d 768, at 773.

See also State v. Hall, 88 Idaho 117, 397 P.2d 261 (1964); Jackson v. Denno, *supra;* State v. Van Vlack, 57 Idaho 316, 65 P.2d 736 (1937).

"Any evidence which logically tends to prove or disprove a fact in issue is relevant and therefore admissible, provided it is not too remote or speculative, or of such slight probative value as to justify the court in excluding it on grounds of immateriality. State v. Farris, 48 Idaho 439, 282 P. 489 (1929). See also State v. Linebarger, 71 Idaho 255, 232 P.2d 669 (1951); State v. Kleier, 69 Idaho 278, 206 P.2d 513 (1949); Williams v. Neddo, 66 Idaho, 551, 163 P.2d 306 (1945); McClain v. Lewiston Interstate Fair & Racing Ass'n, 17 Idaho 63, 104 P. 1015, 25 L.R.A.,N.S., 691 (1909). '* * * while there is no finality to the discretion of the trial court on the point of evidence, the appellate court should hesitate to superimpose its judgment to the contrary as to the probative value of the evidence except as a matter of law, based upon established precedents.' State v. Alvord, 47 Idaho 162, 174, 272 P. 1010, 1013 (1928). See 1 Wigmore on Evidence, 2d ed., § 238, p. 494." State v. Cypher, 92 Idaho 159, 438 P.2d 904, at 915 (1968).

■ Where a demonstration is under the sole, subjective control of the witness, great caution should be exercised in permitting its introduction into evidence. See, e. g., Clark v. Brooklyn Heights R.R. Co., 177 N.Y. 359, 69 N.E. 647 (1904).

■ Sandoval's attorney desired to elicit from him a demonstration of his inability to understand English. Naturally there would be strong temptation to feign ignorance of the language. It would be well-nigh impossible to show that the witness had been faking. Contrarily, if Sandoval's attorney had wished him to demonstrate a working knowledge of English, it would have been impossible or at least difficult for him to pretend to read from an English book, if in fact he was unable to comprehend English, assuming that the selection to be read had been picked at random. Had opposing counsel, on cross-examination, desired to test the witness' ability or inability to understand a lan-

guage, the desire to cooperate on the part of the witness no longer would have been present. Asking Sandoval to demonstrate his lack of understanding on direct examination in the manner attempted at trial was tantamount to asking a leading question. The trial court in its discretion may disallow such questions.[2] The probative effect of such demonstration would be of questionable value. Permitting it might have tended to obscure the issues and confuse the jury. The Court wisely exercised its discretion in refusing to admit the demonstration.

Finally, appellant argues that the condition of probation prohibiting him from driving an automobile constitutes cruel and unusual punishment. U.S. Const., amend. VIII; Idaho Const., art. 1, § 6. Allegedly Sandoval's only means of livelihood is to work as a migrant farm laborer. Such employment, we are told, requires him to drive farm vehicles on the public roads. Denying him the privilege of driving thus prevents him from earning a living. Although the record does not evidence the factual allegations presented in the brief, we shall treat the argument on the legal merits.

"*Parole—Commutation, suspension, withholding of sentence—Probation.*—Whenever any person shall have been convicted, or enter a plea of guilty, in any district court of the state of Idaho, of or to any crime against the laws of the State, except those of treason or murder, the court * in its discretion, may:

1. * Commute the sentence * and confine the defendant in the county jail, or, if the defendant is of proper age, in the State Industrial School * ;

2. * Suspend the execution of the judgment at the time of judgment or at any time during the term of a sentence in the county jail and place the defendant on probation under such terms and conditions as it deems necessary and expedient, or

3. * Withhold judgment on such terms and for such time as it may * * * prescribe and may * place the defendant on probation.

Provided, however, that if the crime involved is a felony and if judgment is withheld as provided in 3. above or if judgment and a sentence of imprisonment to the penitentiary is suspended at the time of judgment in accordance with 2. above and the court shall place the defendant upon probation, it may be to the board of corrections or to some proper person selected and designated by the court, under such terms and conditions as the court deems necessary and expedient; and provided, further that if the crime involved is a misdemeanor, indictable or otherwise, or if the court should suspend any remaining portion of a jail sentence already commuted in accordance with 1. above, the court, if it grants probation, may place the defendant on probation in charge of some proper person selected and designated by the court for that purpose, and make such orders relative thereto as the court in its sound discretion deems necessary and expedient." I.C. § 19–2601

"Probation is not a matter of right; it may be granted the defendant through exercise of sound discretion by the trial court within the ambit of authority conferred by the legislature." Franklin v. State, 87 Idaho 291, 392 P.2d 552 (1964); accord, State v. Gish. 89 Idaho 334, 404 P.2d 595 (1965).

The purpose of probation is to give the defendant an opportunity to be rehabilitated under proper control and supervision. State v. Oyler, 92 Idaho 43, 436 P.2d 709 (1968); State v. Gish, *supra;* Franklin v. State, *supra.* A condition of

---

2. "Leading questions.—A question which suggests to the witness the answer which the examining party desires is denominated a leading or suggestive question. On direct examination leading questions are not allowed, except in the sound discretion of the court, under special circumstances, making it appear that the interests of justice require it." I.C.R. § 9–1203.

probation must be reasonably related to the purpose of probation, rehabilitation. State v. Oyler, *supra.* A condition of probation impossible of fulfillment is improper. State v. Oyler, *supra.* The period of probation may last as long as the maximum period for which defendant might have been imprisoned. Ex parte Medley, 73 Idaho 474, 253 P.2d 794 (1953). A defendant may decline probation, should he consider its terms too onerous, and demand instead to be sentenced by the court. Franklin v. State, *supra,* and cases cited therein.

■ When it is remembered that defendant's crime arose out of the operation of a motor vehicle, the condition of probation prohibiting him from driving bears a reasonable relationship to his crime and to his rehabilitation. To impose such condition was not an abuse of discretion. City of Detroit v. Del Rio, 10 Mich.App. 617, 157 N.W.2d 324 (Ct.App.1968); cf. People v. Caruso, 174 Cal.App.2d 624, 345 P.2d 282 (Dist.Ct.App.1959), cert. denied, 363 U.S. 819, 80 S.Ct. 1259, 4 L.Ed.2d 1517 (1960). There has been no showing that the condition is impossible of fulfillment. Nor is the period of probation excessive.[3]

The judgment is affirmed.

McFADDEN, C. J., and McQUADE and SPEAR, JJ., concur.

COGSWELL, District Judge (concurring in part and dissenting in part).

I concur in the final result reached by the majority. The defendant was properly and fully informed of his constitutional rights and he gave a knowing and intelligent waiver thereof. The judgment of conviction should be affirmed.

Although it is not necessary for the determination reached herein, the majority

opinion holds that the interrogation of Sandoval was not "custodial interrogation" as defined in *Escobedo* and *Miranda.* With this conclusion I must dissent.

I agree that the " * * * evil to be guarded against is the psychological coercion on a person to speak when confronted with official interrogation in a private, isolated, incommunicado, police-dominated atmosphere."

This case was in the accusatory phase at the time of interrogation. Sandoval is a 21 year old, Navajo Indian, with five years of schooling. He was injured from the automobile accident. He was in a surrounding unfamiliar to him, i. e., the hospital. He was confronted with a uniformed officer and the prosecuting attorney of the county. Extensive and complete steps were taken by the officer, in this atmosphere, to inform Sandoval of his constitutional rights guaranteed by *Miranda.* There can be little question that if Sandoval had leaped from the bed and attempted to leave, he would have been detained.

A formal arrest was not made prior to interrogation, however, I do not understand that arrest is essential to placing an accused "in custody." As stated in People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967):

"In other words, if the formality of an arrest were a strict condition precedent to the advent of the accusatory stage, the police could, by delaying the arrest *where the situation did not demand one,* circumvent the accused's right to counsel and nevertheless, subject him to tactics designed to elicit incriminating statements * * *." (emphasis added)

The majority decision may tend to give license to law enforcement officers to focus their investigation on a particular suspect; to carry out a process of interro-

---

3. "In the case of a violation of subdivisions (a) or (b) of said subsection 2 of section 18–4006, the punishment shall be either by imprisonment in the county jail for not more than one (1) year or in the state prison for not more than five (5) years or by a fine of not more than $1,000.00 or by both such fine and either of said imprisonments, and in such cases the jury may recommend by their verdict that the punishment shall be by imprisonment in the county jail." I.C. § 18–4007(2) (a).

gation in order to elicit incriminating statements; and yet be relieved of the sanctions of the *Miranda* decision because the defendant was isolated in a hospital rather than in the atmosphere of the local police station.

In this case it is my opinion that Sandoval's freedom of movement was constructively restricted while in the accusatory stage, and the defendant was "in custody" when the interrogation took place. People v. Arnold, *supra;* State v. Carpenter, *supra.*